IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBIN A. MILLER, | ) | CASE NO. 3:11CV798 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Robin A. Miller ("Miller") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her applications for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42

U.S.C. §§ 416(i) and 423, and Supplemental Security Income ("SSI") under Title XVI of the

Act, 42 U.S.C. § 1381 *et seq.*  Doc. 1.  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the following reasons, the final decision of the Commissioner should be

**AFFIRMED**.

## I.  Procedural History

On August 9, 2006, Miller filed applications for DIB and SSI, alleging a disability onset

date of March 31, 2006.  Tr. 135-44.  Miller claimed that a combination of impairments

prevented her from working, including "avascular necrosis left hip, avascular necrosis right hip,

total left hip replacement, total right hip replacement, antiphospholipid symdrome, Gluteal nerve

neuritis with somatic dysfuncti, sacraliletis with cluneal nerve neuritis, sacroilistis, L5 Lumbar

neuritis, Cardiac SVT, depression and anxiety . . . [and] extreme pain in both hips and back with

standing or sitting for brief episodes."  Tr. 170.  The state agency denied Miller's claims initially

1

on December 19, 2006 (Tr. 56), and on reconsideration on July 6, 2007.  Tr. 112, 119.  On

September 7, 2007, Miller filed a written request for a hearing (Tr. 90-91) and, on October 28,

2009, a hearing was held before Administrative Law Judge Timothy G. Keller (the "ALJ").  Tr.

20-55.

In a comprehensive, 14-page decision dated January 19, 2010, the ALJ determined that

Miller was not disabled.  Tr. 63-83.  In short, the ALJ determined that Miller had certain severe

impairments (status post bilateral hip arthroplasty, degenerative disc disease, cardiomyopathy,

depression, and anxiety) but that her impairments did not meet or equal any of the Listing

Impairments.  Tr. 14.  He further determined that Miller retained the residual functional capacity

("RFC") for a limited range of sedentary work.  Tr. 70.  The ALJ then found that Miller could

perform her own past work as an administrative clerk, as well as other jobs within the national

economy.  Tr. 77-78.  The ALJ therefore concluded that Miller was not disabled.  Tr. 77-78.

Miller requested review of the ALJ's decision by the Appeals Council on March 7, 2010.  Tr.

131-34.  On February 23, 2011, the Appeals Council denied review, making the ALJ's decision

the final decision of the Commissioner.  Tr. 1-6.

## II.  Evidence

### A.    Background

Miller was born on June 22, 1960, and was 49 years old at the time of the administrative

hearing.  Tr. 24.  She graduated from high school and completed the training needed to become

credentialed as a licensed practical nurse ("L.P.N.").  Tr. 180, 240.  Miller was married and lived

with her husband at the time of the administrative hearing.  Tr. 33.

**B.     Medical Evidence**

**1.     Treatment History Concerning Miller's Physical Impairments[1]**

Miller was diagnosed with avascular necrosis ("AVN") of both the left and right femoral heads in the mid-1990s.[2]  Tr. 276, 279.  After unsuccessful core decompression to both hips, Miller underwent a total left hip replacement on February 13, 1996, and a total right hip replacement on June 8, 1996.  Tr. 276, 279.  The orthopedic surgeon who performed the surgeries was Thomas M. Raabe, M.D.  Tr. 276-79.  In a letter dated October 31, 1997, after Miller had recovered from the surgeries, Dr. Raabe found that Miller had no disability and advised management at Blanchard Valley Hospital that she could be gainfully employed in patient care at the hospital as long as she did not lift over 50 pounds on a regular basis (and did not engage in prolonged standing, climbing, or bouncing up and down activities).  Tr. 294.

Miller also treated at Blanchard Valley Medical Associates, with the earliest office note from August 31, 1994.  Tr. 598.  She treated with Gregory A. Ricketts, M.D., after the retirement of her previous physician, Dr. Mount.  Miller's first visit specifically with Dr. Ricketts was on November 20, 2001, and it appears that she saw him on several occasions thereafter.  Tr. 621-38.  His office notes document that Miller complained of chronic leg pain, anxiety, depression, AVN, chronic hip pain, and left knee pain.  Tr. 621-38.

Miller's primary care physician from August 18, 2003 to November 24, 2006, was James Bentley, M.D.  Tr. 372-462.  During her office visits, Miller normally complained that she was in pain, usually citing a different combination of pain on each visit, including lower back pain, left

---

[1]  Miller does not challenge the ALJ's conclusions concerning her mental impairments in this appeal.  Accordingly, this Report & Recommendation shall focus on Miller's medical history as it relates to her physical impairments.

[2]  Avascular necrosis is defined as "the death of bone tissue due to a lack of blood supply. Also called osteonecrosis, avascular necrosis can lead to tiny breaks in the bone and the bone's eventual collapse."  *See* http://www.mayoclinic.com/health/avascular-necrosis/DS00650.  It is unclear from the record when exactly Miller was first diagnosed with AVN.

hip pain, bilateral knee pain, bilateral leg pain, depression, and restless leg syndrome.  *See, e.g.,* Tr. 370, 372, 374, 375.  Dr. Bentley typically prescribed Miller's pain medications and routinely documented that Miller was in no apparent distress ("NAD").  *See, e.g.,* Tr. 432, 434, 436, 438, 440.  He also repeatedly noted no abnormal sensory findings and generally made findings of "tenderness" in the back or hips.  *See, e.g.,* Tr. 430, 432, 436.

The objective medical evidence fails to demonstrate a clear physiological cause of the shifting pain complained of by Miller.  March 2005 radiographs showed a focus of increased activity in the posterior medial aspect of the proximal tibia on the left, which "may represent a small stress fracture and/or avascular necrosis."  Tr. 220.  But an MRI of the left knee in April 2005 showed no evidence of tear, occult fracture or bone contusion.  Tr. 465.  In addition, an MRI of the right knee in April 2005 showed only "mild" changes of cartilage thinning and no evidence of cruciate or ligament tear.  Tr. 475.  Bone imaging of Miller's entire body in July 2005 showed findings consistent with "healing microfracture or stress fracture" in the medial right tibia.  Tr. 324.

On June 3, 2005, Dr. Raabe reviewed Miller's MRIs and stated that he believed Miller experienced a migratory poly arthropathy.  Tr. 292.  He concluded that she did not have a surgical problem, and that she should instead see a rheumatologist.  Tr. 292.  On July 18, 2005, Dr. Raabe reviewed the bone scans and films and determined that any pain Miller had described in the lower extremities was "not coming from her artificial hips."  Tr. 292.  Dr. Raabe explained that there did "not appear to be any loosening on the bone scan or any wear on her regular films."  Tr. 292.

Subsequent x-rays in 2006 showed "good position and alignment" of the left hip arthroplasty, with a "slight radiolucent line at the superior aspect of the femoral component" that

suggested a "possibility of loosening;" "however, the majority of the femoral component [did] not show any other evidence of radioluceny."  Tr. 340.  X-rays of the thoracic spine in January 2007 showed only "minimal" mid-thoracic spondylosis.  Tr. 510.

Miller began treating with James A. Gideon, M.D., a rheumatologist, on June 23, 2005. Tr. 316.  At her initial visit, Dr. Gideon diagnosed Miller with arthralgias (joint pain).  Tr. 319. He also stated that he "suspect[ed]" that the source of the intermittent arthralgias she described could be caused by an auto-immune condition called antiphospholipid syndrome ("APS"), as well as small joint infarctions.[3]  Tr. 319, 512.  Dr. Gideon felt strongly that, as a preventive measure to avoid possible thrombolytic events,[4] Miller should initiate treatment with Coumadin, a blood thinner.  Tr. 512.  However, Miller did not initiate Coumadin treatment as advised, citing a lack of health insurance.[5]  Tr. 215.  There is no evidence in the record that Miller ever experienced any thrombolytic events.

On July 11, 2005, Dr. Gideon wrote a letter to Dr. Ricketts, one of Miller's primary care physicians.  Tr. 326-37.  He noted that Miller continued to experience severe intermittent arthralgias in the knees bilaterally, and also in the shoulders.  Tr. 326.  He ruled out fibromyalgia as a cause of Miller's pain.  Tr. 326.  Dr. Gideon stated that he "suspects [Miller] is having small joint infarcts, and if this is the case she should be on Coumadin."  Tr. 327.

Generally, other than AVN (which led to Miller's hip replacement surgeries in 1996) and APS (which did not result in any thrombolytic events), the medical records diagnose "pain" –

---

[3] Antiphospholipid syndrome ("APS") is a disorder in which the immune system mistakenly produces antibodies against certain normal proteins in the blood.  APS can cause blood clots to form within arteries or veins, which puts a patient at increased risk for organ damage or stroke.  *See* http://www.mayoclinic.com/health/antiphospholipid-syndrome/DS00921.

[4] APS may lead to the formation of blood clots in the legs, a condition known as deep vein thrombosis (DVT).  *See* http://www.mayoclinic.com/health/antiphospholipid-syndrome/DS00921.

[5] It appears from subsequent medical records that Miller submitted to the Appeals Council that she did eventually initiate therapy with Coumadin under Dr. Gideon's care.  Tr. 8.

"hip pain," "low back pain," and other "pain" – all of which are subjective symptoms, without clearly identifying an underlying pathology for the reported pain symptoms. *See, e.g.,* Tr. 385, 387, 397, 399.

On September 1, 2006, Dr. Ricketts submitted a letter to the Social Security Administration ("SSA") in support of Miller's disability claim. Tr. 310. In this letter, Dr. Ricketts stated that he had seen Miller for various issues on "several occasions since 11/20/2001 up until 1/04/2006." Tr. 310. He then concluded that Miller "meets criteria in my estimation for disability for her hip and leg pain osteonecrosis." Tr. 310.

On March 23, 2007, Dr. Gideon submitted a letter to Miller's attorney regarding her claim for disability. Tr. 512. Dr. Gideon stated that a bone scan showed additional AVN in her leg. Tr. 512. He also noted that Miller "continues to have hip and back pain and bone pain, and this would make it very difficult for her to pursue gainful employment." Tr. 512. He reported that Miller "desperately needs medical coverage in order to be on lifetime Coumadin, since she is at severe risk of thrombotic events which could be disabling and/or life threatening." Tr. 512.

On December 3, 2008, Dr. Gideon completed a worksheet for Listing 1.02[6] for Miller and opined that she met the requirements of Listing 1.02 for dysfunction of joints. Tr. 674. Dr. Gideon checked the boxes for each element of Listing 1.02, and noted that Miller "had both hips replaced due to AVN from APS, which is not treated with Coumadin." Tr. 674. Dr. Gideon noted that "x-rays suggest loosening of femoral component of hip prosthesis." Tr. 674.

---

[6] Listing 1.02 describes major dysfunction of a joint(s) (due to any cause) and provides, in relevant part:
    Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joints(s). With:
    A.  Involvement of one major peripheral weight-bearing joint (i.e. hip, knee, or ankle), resulting in an inability to ambulate effectively . . . ; or
    B.  Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively . . . .

On that same date, Dr. Gideon also completed a form captioned "Medical Opinion as to Residual Functional Capacity." Tr. 675-78. He opined that Miller could occasionally and frequently lift 10 pounds, and noted that she would be limited by her ability to weight bear on her hips. Tr. 675. Dr. Gideon found that Miller could stand and/or walk for less than 2 hours and could sit for less than 6 hours in an 8-hour workday. Tr. 675-76. He did not explain the basis for these limitations. Tr. 675-76. Dr. Gideon also found that pushing and/or pulling was limited in Miller's lower extremities, and that she could never climb or crawl, and could only occasionally balance, kneel, crouch, or stoop. Tr. 676.

### 2. State Agency Physicians

On October 16, 2006, Miller attended a physical consultative examination with state agency physician Michael Lindamood, M.D., M.P.H. Tr. 338. Dr. Lindamood is a rheumatologist in practice with Dr. Gideon at Blanchard Valley Hospital. Tr. 338. Dr. Lindamood's comprehensive examination of Miller revealed few physical abnormalities other than "tenderness" over the sacroiliac joints and trochanteric bursa. Tr. 338-39. Dr. Lindamood found that Miller had a normal range of motion in her lumbosacral spine and that she walked with an antalgic gait but "did not require any ambulatory aids." Tr. 338. Despite tenderness, Miller also had a normal range of motion in both hips. Tr. 339. Dr. Lindamood also found that Miller's knees were likewise unremarkable, with good ligamentous stability and a normal range of motion. Tr. 339. Examination of the ankles and feet was also unremarkable. Tr. 339. Miller's neurological and sensory examinations were normal, as was strength testing and motor examination. Tr. 339. Miller's shoulders had a normal range of motion with good stability. Tr. 339. Her elbows, wrists, and hands were unremarkable, and her grasp, grip, manipulation, and fine coordination were also all normal. Tr. 339. Based on his interpretation of x-rays that he

read to show "changes of loosening of the femoral component" of Miller's artificial hip, Dr.

Lindamood stated that she would be limited "from occupations requiring any weight bearing

activity at all or stressful weight bearing activity such as going up and down stairs or ladders."

Tr. 339.  Dr. Lindamood also filled out detailed range of motion charts showing largely normal

ranges of motion throughout Miller's body (Tr. 342-44) and confirmed that there was no

evidence of muscle spasm or muscle atrophy.  Tr. 342.

On November 27, 2006, state agency physician Edmond Gardner, M.D. reviewed

Miller's medical records and assessed her physical residual functional capacity.  Tr. 481-88.  Dr.

Gardner found that Miller could stand and walk at least 2 hours in a workday (15 minutes at a

time), and sit about 6 hours in a workday.  Tr. 483, 494.[7]  He eliminated use of foot controls,

commercial driving, and uneven terrain.  Tr. 483, 485.  He also found that Miller could both

occasionally and frequently lift 10 pounds (Tr. 482); could occasionally stoop (Tr. 497);  and

could occasionally climb ramps and stairs, but could not perform other postural maneuvers.  Tr.

483.  Dr. Gardner also reiterated the findings of Dr. Lindamood's comprehensive physical

examination, noting that Miller had a normal range of motion in the lumbar spine, a negative

straight leg raising test, normal range of motion of both hips, normal sensory function, and

normal motor function with full, 5/5 strength in all extremities.  Tr. 483.  Nonetheless, in light of

radiographic evidence of possible loosening of the left hip femoral components and Miller's

history of hip arthroplasty, Dr. Gardner limited Miller to sedentary work.  Tr. 483.

---

[7]  Dr. Gardner initially checked the boxes for sitting less than 6 hours and no stooping but subsequently confirmed
that he had made an error on the initial form when he later reviewed the file.  Tr. 494.

**C.  Testimonial Evidence**

**1.  Miller's Testimony**

On October 28, 2009, Miller appeared with counsel and testified at the administrative

hearing.  Tr. 20-55.  She discussed her work history and stated that she managed her deceased

father's business from 2002 until 2006, but that she performed most of the work "from [her]

couch at home."  Tr. 24-25.  Miller testified that she used a computer in her home to create a

better catalog in an attempt to increase sales for the business.  Tr. 25.  She also testified that the

business moved locations in October of 2005, at which point it was basically in a holding pattern

pending sale.  Tr. 26.  The ALJ asked Miller about a medical treatment note from April 4, 2006,

which stated that Miller was then in the "process of moving her business."  Tr. 27, 388.  Miller

responded "I take so many drugs I don't remember."  Tr. 27-28.  She then explained that her

short term memory was not too good and attempted to clarify her testimony, stating that March

2006 is when everything with the business pretty much closed down.  Tr. 28-29.  Before her hip

replacement surgeries in 1996, Miller worked as an L.P.N. for a number of years at Blanchard

Valley Regional Hospital.  Tr. 47.  After her surgeries, she worked at an administrative job at St.

Catherine's Care Center.  Tr. 47.

Miller then testified about her impairments and explained that she has pain in her hips,

knees, ankles, right wrist, and her elbows.  Tr. 34.  She stated she has problems with blood

clotting because of her AVN and that this is the reason she had her hips replaced.  Tr. 34-35.  In

describing her pain, Miller stated that "it feels like there is glass in my joints, I mean literally; it

feels like each step even lifting up they feel like their loose.  With each step it just feels like glass

crumbling into the joints."  Tr. 34.  Miller testified that she uses crutches "80 to 90 percent of the

time."  Tr. 30.  She stated that she also had a walker and a wheelchair, but they "blew away" in a

tornado. Tr. 30. When confronted with the lack of medical notes concerning her use of crutches, Miller stated that she did not use crutches to visit doctors because she did not want to impose on their "good will" by taking the extra time that would be consumed to walk back to the office on crutches. Tr. 32. She testified that she could stand without pain for less than 5-10 minutes and could walk for about 11 feet before feeling pain. Tr. 38. Miller further stated that she feels pain if she engages in push/pull movements and that bending "kills" her lower back. Tr. 38.

### 2. Vocational Expert's Testimony

Carl Hartung, a vocational expert, also testified at the hearing. Tr. 46-54. The VE stated that Miller had previously worked as an L.P.N. (skilled position generally performed at a medium exertional level, but was performed by Miller at a very heavy exertional level), administrative clerk (generally a semi-skilled position performed at a light exertional level, but was performed by Miller at an unskilled level and sedentary exertional level). Tr. 48-49. In a hypothetical, the ALJ asked the VE whether Miller could perform any of her past relevant work or any other work available in the national economy if she could perform sedentary work with the following limitations:

> [L]ifting, carrying, pushing, pulling 10 pounds occasionally and 10 pounds frequently, able to sit for 6 hours a day and able to stand and walk for 2 hours each out of an 8-hour workday, limited to only occasional climbing of ramps and stairs and never any ladder, rope, or scaffold, only occasional stooping, and never any balancing, crouching, kneeling, or crawling, no moving machinery or unprotected heights, no commercial driving or walking on uneven terrain, she retains the ability to understand, remember, and carry out simple tasks and instructions, able to maintain concentration and attention for 2-hour segments over an 8-hour work period, able to respond appropriately to supervisors and coworkers in a task oriented setting where contact with others is casual and infrequent, and able to adapt to simple changes and avoid hazards in a setting without strict production standards . . . .

Tr. 49. The VE responded that Miller could perform her past relevant work as an administrative clerk, as she actually performed the job. Tr. 49-50. In addition, the VE testified that Miller

10

could perform the work of an inspector (which includes sorters) (50,232 jobs nationally and 2,951 in Ohio), an information clerk (274,957 jobs nationally and 9,456 jobs in Ohio), and an order clerk (267,562 jobs nationally and 7,914 jobs in Ohio).  Tr. 50.  The ALJ then asked the VE to consider the additional limitation that Miller would need to take unscheduled breaks throughout the entire workday in order to lie down to relieve her pain.  Tr. 50.  The VE responded that this additional limitation would preclude all employment.  Tr. 50-51.

### III.  Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).  In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,

claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.   If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920 (b)-(g); *see also* *Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

### IV.  The ALJ's Decision

In his January 2010 decision, the ALJ determined that Miller had not engaged in substantial gainful activity since March 31, 2006, her alleged disability onset date. Tr. 68.  The ALJ determined that Miller had the following severe impairments: status post bilateral hip arthroplasty, degenerative disc disease, cardiomyopathy, depression, and anxiety.  Tr. 68.  The ALJ found that Miller did not have an impairment or combination of impairments that met or medically equaled one of the Listed Impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1.  Tr. 69. The ALJ next determined that Miller retained the RFC to perform sedentary work subject to the following limitations:

[C]laimant can lift or carry 10 pounds frequently and 10 pounds occasionally (from very little, up to 1/3 of an 8-hour workday); the claimant can stand and/or walk (with normal breaks) for a total of 2 hours in an 8-hour workday; the

claimant can sit (with normal breaks) for a total of 6 hours in an 8-hour workday; the claimant can occasionally climb and stoop; however, the claimant should never climb ladders, ropes, or scaffolds, balance, crouch, kneel, and crawl; the claimant should avoid unprotected heights and moving machinery; the claimant should not engage in any commercial driving; the claimant should never walk on uneven terrain; the claimant should only engage in simple tasks with simple instructions; the claimant is able to maintain concentration and attention for two hour segments over an 8-hour work period; oriented setting where contact with others is casual and infrequent; and the claimant is able to adapt to simple changes and avoid hazards in a setting without strict productions standards.

Tr. 70.  Finally, after considering her vocational factors, RFC, and the evidence from the VE, the ALJ found that Miller was able to perform her past relevant work as an administrative clerk, as she actually performed the job, as well as other jobs that existed in significant numbers in the national economy.  Tr. 77-78.  Thus, the ALJ concluded that Miller was not disabled.  Tr. 78-79.

## V.  Arguments of the Parties

Miller objects to the ALJ's decision on four grounds.  First, she asserts that the ALJ erred because he failed to provide adequate justification for his rejection of key evidence from her treating physicians.   Second, Miller argues briefly that the ALJ "ignored" some of her medical diagnoses, including AVR, APS, osteonecrosis, and restless leg syndrome.  Third, Miller objects to the ALJ's conclusion that her complaints of debilitating pain were not fully credible.  Fourth, Miller asserts that the ALJ erred in failing to resolve alleged conflicts between the VE's testimony and the Dictionary of Occupational Titles ("DOT").

In response, the Commissioner argues the ALJ reasonably found that Miller was not disabled.  The Commissioner contends that ALJ properly assessed Miller's credibility and properly weighed the opinions of her treating physicians.  The Commissioner also asserts that the ALJ conducted an exhaustive review of Miller's alleged impairments.  Finally, the Commissioner claims that the VE's testimony was not inconsistent with the DOT.

13

## VI.  Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

A.     **Substantial Evidence Supports the ALJ's Credibility Determination**

Miller claims that she is so incapacitated by pain that she could not perform even simple, sedentary work.  However, she presented minimal objective medical evidence to support her claim that she was totally disabled by pain.  Because her pain was mostly evidenced by her subjective statements, Miller's credibility was a critical issue for the ALJ.  After carefully reviewing the medical evidence and Miller's testimony regarding her pain, the ALJ found that Miller's subjective complaints of pain were less than fully credible.  Tr. 77.  Miller argues that the ALJ erred in making an adverse credibility determination.  Doc. 14, pp. 12-14.  Specifically,

14

Miller contends that the reasons given by the ALJ were insufficient to reject her subjective complaints of debilitating pain.  This argument is without merit.

A disability claim can be supported by a claimant's subjective complaints, as long as there is objective medical evidence of the underlying medical condition in the record.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d at 475.  "[I]f disabling severity cannot be shown by objective medical evidence alone, the Commissioner will also consider other factors, such as daily activities and the type and dosage of medication taken."  *Id.* (citing 20 C.F.R. § 404.1529(c)(3)).  To evaluate the credibility of a claimant's subjective reports of pain, a two-part analysis is used.  20 C.F.R. § 416.929(a); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).  First, the ALJ must determine whether the claimant has an underlying medically determinable impairment which could reasonably be expected to produce the claimant's symptoms.  *Rogers,* 486 F.3d at 247.  Second, if such an impairment exists, then the ALJ must evaluate the intensity, persistence and limiting effects of the symptoms on the claimant's ability to work.  *Id.*  The ALJ should consider the following factors in evaluating a claimant's symptoms:

1) the individual's daily activities;
2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;
3) factors that precipitate and aggravate the symptoms;
4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.; see also* 20 C.F.R. §§ 404.1529(c) and 416.929(c); Social Security Rule ("SSR") 96-7p, 1996 WL 374186, *3.

However, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones,* 336 F.3d at 476 (citations omitted).  An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.  *Rogers*, 486 F.3d at 247.  If the ALJ rejects a claimant's testimony as not being credible, the ALJ must state his reasons so as to make obvious to the individual and to any subsequent reviewers the weight given to the individual's statements and the reason for that weight.  *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); Social Security Rule ("SSR") 96-7p, 1996 WL 374186, *2.

Here, the ALJ undertook the appropriate analysis and determined that Miller's statements about her limitations lacked credibility.  Tr. 70-71.  The ALJ afforded Miller some benefit of the doubt, despite the limited objective evidence, and found that her medically determinable impairments could reasonably be expected to cause the alleged symptoms.  Tr. 71.  The ALJ then proceeded with the analysis of her subjective symptoms of pain and determined that Miller's statements concerning the intensity and limiting effects of her pain were not entirely credible to the extent she claimed she was incapable of performing even simple, sedentary work.  Tr. 71.  In reaching this determination, the ALJ provided several reasons for discounting Miller's credibility, including internal inconsistencies in her testimony and inconsistencies with other evidence in the case record.  *See* SSR 96-7p, 1996 WL 374186, at *5.  For example, Miller appeared at her hearing on crutches, which the ALJ found surprising in light of the medical

record.  Tr. 30.  Miller testified that she used crutches "80 to 90 percent of the time" Tr. 30.  She also mentioned that she used a walker and a wheelchair, but that these items "blew away" in a tornado.  Tr. 30.  The ALJ questioned these assertions based on his familiarity with the voluminous medical record, which contained a dearth of references to crutches or wheelchairs.  Tr. 33.  In response, Miller stated that, although she used crutches almost all the time, she chose not to use them for medical appointments because she did not want to impose on the doctors' "good will."  Tr. 33.  The ALJ was not compelled to accept such facially dubious testimony and relied, instead, on the comprehensive medical records that showed Miller ambulating with a limp but without assistive devices.  *See, e.g.,* Tr. 338.

The ALJ also noted the discrepancy in Miller's testimony regarding the operation of her deceased father's business.  Miller testified that she worked managing the business until March 2006, when she sold the business.  Tr. 24-25.  She also testified that the business moved locations in October of 2005, at which point, she stated, it was basically in a holding pattern pending sale.  Tr. 26.  However, the ALJ noted that a medical treatment note from April 4, 2006, stated that Miller was then in the "process of moving her business."  Tr. 27, 388.  Miller attempted to explain this discrepancy by stating that, "I take so many drugs I don't remember."  Tr. 27-28.  She then attempted to clarify her testimony, stating that March 2006 is when everything with the business pretty much closed down.  Tr. 28-29.  The ALJ did not find this response to be persuasive.

Moreover, the theme of Miller's disability claim was that she was largely confined to her "couch all day."  Tr. 170.  She claimed to watch "TV all day every day lying on the couch."  Tr. 189.  She likewise testified that she managed her family business for years primarily from her living room couch.  Tr. 25.  She even claimed that she watched her 2-year-old grandchild 4 hours

a day, 3 days a week, from the confines of her living room.  Tr. 242.  However, medical records showed Miller vacationing in Florida (Tr. 440), remodeling her office (Tr. 448), and moving her business.  Tr. 388.  Even after Miller alleged that she became disabled, the record demonstrated that she continued to make weekend trips every week to Lake Erie (Tr. 189); drive herself to doctor appointments (Tr. 330); shop for food and other items (Tr. 333); wash dishes and sweep the floor (Tr. 333-34); and cook supper (Tr. 242).  In addition, in July 2006, Miller asked Dr. Bentley to increase her pain medications because she was "more active during summer."  Tr. 378.  Miller was likewise able to attend the necessary continuing education classes to maintain her license as an L.P.N. after she filed for disability.  Tr. 163.  She even watched a toddler 3 days a week, 4 hours a day, as recently June 2009 (Tr. 242), yet she testified shortly thereafter at the October 2009 hearing that she could walk no more than "11 feet."  Tr. 38.  In light of all this evidence, the ALJ was not compelled to accept Miller's highly contradicted assertion that she was in such constant, severe pain that she could hardly leave the couch in her living room.

Miller asserts that her claims of debilitating pain were supported by evidence in the record and points to a small number of isolated treatment notes dealing with her pain.  However, where the ALJ's credibility determination is supported by substantial evidence, a reviewing court may not re-examine whether the record could support a contrary finding.  *See Casey v. Sec. of HHS*, 987 F.2d 1230, 1233 (6th Cir. 1993).  The ALJ properly assessed the medical and non-medical evidence in this case in accordance with governing law.  He credited Miller with pain and limitations from her medically determinable impairments but also found, based on substantial evidence in the record, that the limiting effects of those impairments were not as severe as Miller alleged and did not preclude all work.

Miller also argues that the ALJ erred because he did not individually discuss each of the seven factors listed in SSR 96-7p for evaluating a claimant's symptoms. However, the ALJ's written decision demonstrates that he considered all of the relevant evidence. Tr. 20-22; *See Cross*, 373 F. Supp. at 732-33. The ALJ discussed a number of Miller's daily activities that could be deemed inconsistent with her claimed inability to perform any type of work. Tr. 69, 71, 76. These include the fact that she prepared her own meals, washed dishes, folded clothes, vacuumed the floor, drove a car, visited her children, went to Lake Erie on weekends, and kept her nursing license active. Tr. 69, 76. The ALJ also discussed the location, duration, frequency, and intensity of symptoms (Tr. 71); factors that precipitate or aggravate symptoms (Tr. 71, 76); the type, dosage, effectiveness, and side effects of medications (Tr. 77); treatment other than medication (Tr. 71); and other measures to relieve symptoms. Tr. 71. While the ALJ could have been more precise in tying his discussion of the evidence to the seven factors, his analysis was sufficiently clear to allow a reviewing court to determine that he considered all of the relevant evidence, as well as the seven regulatory factors, in reaching his credibility determination. The ALJ's analysis is therefore sufficient to sustain the credibility determination. *See, e.g., Cross, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005)* (finding that the ALJ need not analyze all seven factors identified in the regulations).

**B.     The ALJ Properly Evaluated the Medical Source Opinions**

Miller also contends that the ALJ erred because he did not properly evaluate the opinions of her treating sources. Doc. 17, p. 5. Specifically, she argues that the ALJ erred in giving less than controlling weight to the opinions of Dr. Gideon, her treating rheumatologist, and Dr. Ricketts, her primary care physician. Doc. 14, pp. 5-11. These arguments are without merit.

Under the treating physician rule, the opinion of a treating source is entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). If the opinion of a treating source is not accorded controlling weight, an ALJ must consider certain factors in determining what weight to give the opinion, such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(d), 416.927(d).

If an ALJ assigns less than controlling weight to a treating source's opinion, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. However, the ALJ is not obliged to explain the weight afforded to each and every factor that might pertain to the medical source opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x. 802, 804 (6th Cir. 2011); *Allen v. Commissioner of Social Security*, 561 F.3d 646, 651 (6th Cir. 2009) (even a "brief" ALJ statement identifying such factors will be found adequate to articulate "good reasons" to discount a treating physician's opinion).

### 1. Dr. Gideon

Dr. Gideon provided several medical opinions in connection with Miller's disability claims. First, in a letter to Miller's attorney dated March 23, 2007, Dr. Gideon stated that Miller "continues to have hip and back pain and bone pain, and this would make it very difficult for her

to pursue gainful employment." Tr. 512.  Second, in a worksheet dated December 3, 2008, Dr. Gideon opined that Miller met all of the elements of Listing 1.02 for dysfunction of joints.  Tr. 674.  The ALJ evaluated each of these opinions in accordance with agency regulations.

The ALJ first considered the opinion in Dr. Gideon's March 23, 2007, letter and stated that Dr. Gideon was essentially opining that "claimant is disabled from work because of her hip, back and bone pain; without explanation as to what may be causing it or how it would impede the claimant's ability to work." Tr. 74-75.  To the extent that Dr. Gideon concluded that Miller was unable to work, the ALJ was not obligated to give any weight to this opinion.  A medical source's statement on an issue reserved for the Commissioner, such as an assertion that a claimant is "disabled" or "unable to work," is a legal conclusion and not a medical opinion.  20 C.F.R. § 416.927(e).  Such statements are not entitled to any special significance.  20 C.F.R. § 416.927(e)(3).  "The determination of disability is ultimately the prerogative of the Commissioner, not the treating physician." *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004).

Moreover, the ALJ reasonably assigned limited weight to Dr. Gideon's opinion regarding Miller's ability to work because of her pain.  Tr. 74-75.  In reaching this decision, the ALJ discussed the lack of objective clinical evidence as to the cause and severity of Miller's alleged pain.  Indeed, he noted that Dr. Gideon diagnosed APS, but did not explain how APS could cause the pain that Miller described.  Tr. 74.  The ALJ found it significant that Dr. Gideon's opinion appeared to be based primary on Miller's subjective complaints of pain.  Tr. 74, 512.  A physician's opinion based on a claimant's subjective allegations, rather than the medical evidence, is not entitled to significant weight.  *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 391 (6th Cir. 2004).  In addition, the ALJ discussed the limited treatment relationship between Miller

and Dr. Gideon.  Tr. 74.  Miller saw Dr. Gideon on March 23, 2007, and Dr. Gideon based his opinion on that appointment.  Prior to that appointment, Miller had not been seen by Dr. Gideon since July 22, 2005.  Tr. 72, 314.  The ALJ found that the lengthy gap in treatment cast doubt on the reliability of Dr. Gideon's opinion.  Further, the ALJ noted that Dr. Gideon's own treatment notes contradicted his opinion regarding Miller's debilitating pain.  Tr. 74-75.  In a treatment note from July 22, 2005, Dr. Gideon reported that Miller's "joint pain is all gone."  Tr. 75, 314.  The fact that Miller had no pain in July 2005 is at odds with Dr. Gideon's opinion in 2007 that her pain was so severe that it was debilitating.  The ALJ also found that Dr. Gideon's suggestion that Miller was disabled due to APS was not be supported by the evidence.  Dr. Gideon stated that APS put Miller at serious "risk" of potentially disabling thrombic events, but there is no evidence in the record that Miller ever had a thrombic event.  Tr. 75, Tr. 512.  The ALJ correctly explained that disability is not "predicated on what might happen, only what has happened."  Tr. 75.  *See* 42 U.S.C. § 423(d)(1)(A).

The ALJ's explanation demonstrates that he properly considered the regulatory factors and discounted Dr. Gideon's opinion based on his limited treatment relationship with Miller, the supportability of his opinion, and the consistency of his opinion with the record.  Thus, the ALJ stated good reasons for giving limited weight to Dr. Gideon's opinion that Miller was disabled because of her pain.

The ALJ also carefully analyzed Dr. Gideon's opinion that Miller met Listing 1.02 and reasonably assigned limited weight to this opinion.  Tr. 75-76.  As discussed above, Listing 1.02 requires, *inter alia*, a finding that the claimant has an "inability to ambulate effectively," which is defined as "extreme limitation of ability to walk (i.e. insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device that limits the

functioning of both upper extremities.).”  Tr. 674.  *See* 20 C.F.R. part 404, Subpt. P, App. 1, Listing 1.02A.[8]

In the Listing 1.02 worksheet that Dr. Gideon completed, he indicated that Miller had an “inability to ambulate effectively” and noted that Miller “had both hips replaced due to AVN from APS, which is not treated with Coumadin.”  Tr. 674.  The ALJ found that Dr. Gideon’s opinion with regard to Listing 1.02 was not well-supported by “the objective or other substantial evidence of record.”  Tr. 76.  In reaching this decision, the ALJ noted that Miller had failed to provide any objective proof that she needed to use crutches or that her ability to walk was otherwise extremely limited.  Indeed, the ALJ stated that, “[i]n a thorough review of approximately 528 pages of medical records, the only time the undersigned found any reference by a third party that the claimant was using crutches, appears in a treating source note from 1996.”  Tr. 75.  He also noted that range of motion testing performed by Dr. Lindamood indicated that Miller did not have any extreme limitations in her ability to walk.  Tr. 75-76.  The ALJ found that the “longitudinal record presents minimal evidence in terms of treatment of physical disorders, with the claimant herself indicating that she did not use an ambulatory aid when she visited her doctor.”  Tr. 76.  Therefore, based on the lack of persuasive evidence that Miller was unable to ambulate effectively, the ALJ gave only limited weight to Dr. Gideon’s opinion that she met all of the requirements for Listing 1.02.  The ALJ’s explanation demonstrates that he properly discounted this opinion under the regulatory factors of supportability and consistency.  Accordingly, the ALJ provided good reasons for discounting Dr. Gideon’s opinion regarding Listing 1.02 and complied with agency regulations.

In sum, the ALJ applied the correct legal standard and provided good reasons for assigning limited weight to the opinions of Dr. Gideon.  Accordingly, the ALJ did not violate the

---

[8]  Miller does not argue that she had an inability to perform fine and gross movements under Listing 1.02B.

treating physician rule.

## 2. Dr. Ricketts

In the subheading for treating physician rule argument, Miller also alleges that the ALJ did not properly weigh the opinion of Dr. Ricketts, her primary care physician.  Doc. 14, p. 5. However, Miller does not make any specific arguments with regard to Dr. Ricketts in the body of her argument or identify what opinion(s) by Dr. Ricketts the ALJ improperly evaluated.  Doc. 14, pp. 5-11.  "[I]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."  *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."); *Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006); *see also Erhart v. Sec'y of Health & Human Servs.*, 989 F.2d 534, 537 n. 5 (7th Cir. 1992) (applying waiver rule because judges need not devote time to "discussion of argument, raised if at all, 'in a very opaque manner.'").  Miller has failed to develop her argument with regard to Dr. Ricketts beyond a cursory mention of his name in the argument subheading.  The Court will not speculate as to what Miller's arguments might be with regard to Dr. Ricketts.  This issue is therefore deemed waived.

## 3. Dr. Lindamood

Miller also contends that the ALJ did not properly evaluate the opinion of Dr. Lindamood, a state agency physician who examined Miller on October 14, 2006.  Doc. 14, p. 7. As discussed above, Dr. Lindamood performed a thorough physical examination of Miller.  Tr. 338-39.  Based on his interpretation of x-rays that he read to show "changes of loosening of the femoral component" in her left hip, Dr. Lindamood opined that Miller would be limited "from occupations requiring any weight bearing activity at all or stressful weight bearing activity such

24

as going up and down stairs or ladders." Tr. 339.  Miller argues that ALJ improperly discounted this opinion.  Her argument is without merit.

Because Dr. Lindamood was not a treating physician, his opinion is not entitled to the same deference as a treating source's opinion.  *See, e.g., Barker v. Shalala,* 40 F.3d 789, 794 (6th Cir. 1994).  The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and her maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records. *Id.*  Dr. Lindamood examined Miller on only one occasion, and the rationale of the treating physician doctrine does not apply here. *Id.*

Furthermore, it is clear from the ALJ's decision that he did not simply ignore or discard Dr. Lindamood's findings.  He discussed those findings in detail and, to a large extent, accepted his findings, and in fact pointed to those findings to contradict Dr. Gideon's opinion.  Tr. 75-76. As noted above, Dr. Lindamood examined Miller and found strong physical functioning throughout her body with full range of motion, full strength, and no atrophy (Tr. 338-42), making his report generally contradictory to Miller's claim of total disability.  Miller argues, however, that the ALJ was required to accept the Dr. Lindamood's assertion that Miller would be precluded from "any weight bearing activity at all." Tr. 339.  Miller misinterprets Dr. Lindamood's opinion.   It does not appear that, despite his findings of strong physical function throughout Miller's body and his notation that Miller used no ambulatory aides, Dr. Lindamood intended to preclude Miller from even sedentary work.  Rather, it appears that Dr. Lindamood was inartfully attempting to state that Miller could not perform any stressful weight bearing activity such as going up and down stairs or ladders.  In any event, even if Dr. Lindamood was

25

opining that Miller could not perform any weight bearing activity whatsoever, including sedentary work, the ALJ reasonably found that this opinion was contrary to other evidence in the record.  The ALJ noted that Dr. Lindamood based his opinion on an x-ray of the left hip, which he interpreted to show "loosening" of the femoral component of the appliance.  The ALJ explained that other imaging tests suggested otherwise.  Tr. 73, 292. The ALJ noted that Dr. Raabe obtained imaging of Miller's hips in 2005 and found that there was no loosening of the artificial hips.  Tr. 292.

In addition, Dr. Lindamood's finding regarding the loosening of Miller's hip appliance was not critical to the ALJ ultimate determination because the ALJ actually accepted that finding.  Dr. Gardner, the state agency physician whose opinion the ALJ gave significant weight, accepted Dr. Lindamood's view of the radiographic evidence but nonetheless confirmed that Miller could perform sedentary work.  Tr. 74, 483.  Specifically, Dr. Gardner (1) accepted that there may be some loosening of the femoral components, (2) accepted the findings of Dr. Lindamood's physical examination, and (3) agreed with Dr. Lindamood's conclusion that Miller "should avoid work with lifting and carrying and going up and down stairs and ladders" to account for the effects of any loosening and Miller's status post-hip replacement.  Tr. 482-83. The ALJ agreed with Dr. Gardner that the weight of the evidence supported significant, but not work-preclusive, limitations.  Tr. 73-74, 77.

Based on the foregoing, the ALJ properly evaluated the opinion of Dr. Lindamood in accordance with agency regulations.

## C.    The ALJ Properly Considered Miller's Non-Severe Impairments in Reaching his RFC Determination

Miller also asserts that the ALJ "ignored" some of her medical diagnoses in reaching his disability determination.  Doc. 14, p. 11.  Miller essentially argues that the ALJ should have

found several other conditions for which she was diagnosed to be severe impairments, including AVN, ASP, and osteonecrosis.  Doc. 14, p. 11.  Miller bears the burden of establishing that these conditions were severe impairments.  *Murphy v. Sec'y of Health & Human Servs.*, 801 F.2d 182, 185 (6th Cir. 1986) ("Plaintiff must prove that the impairment is severe and that it significantly limits his ability to perform basic work activities.").  Miller argues that these impairments should have been found to be severe simply because she was diagnosed with the impairments.  This argument is without merit because the mere diagnosis of physical impairment does not equate to disability.  *See, e.g., Foster v. Bowen*, 853 F.2d 483, 488 (6th Cir. 1988).  Instead, it is the demonstrated functional limitations imposed by a condition in a particular individual that determine disability.  *Roark v. Astrue*, No. 6:10CV67, 2011 WL 1226874, at *4 (E.D. Ky. March 30, 2011) (citing *Johns v. Bowen,* 821 F.2d 551, 555 (11th Cir.1987)).  A diagnosis, without more, says nothing about the severity of a condition.  *Id.* (citing *Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir.1988)).

In any event, the ALJ exhaustively reviewed the medical evidence in his 14-page decision and discussed many of Miller's diagnosed impairments, even though he did not find them to be severe.  *See, e.g.,* Tr. 74, 75 (discussing APS and AVN).  In addition, the ALJ thoroughly reviewed the findings and opinions of the various medical sources in the record, which in turn addressed the other impairments Miller claims the ALJ ignored.  *See, e.g.*, Tr. 482 (Dr. Gardner's opinion, discussing, *inter alia*, APS and lumbar neuritis allegations).  Thus, the ALJ adequately considered all of Miller's impairments.

Moreover, an ALJ's failure to recognize an impairment at Step Two does not constitute reversible error if the ALJ accounts for all of the claimant's impairments in his RFC determination, including those found not to be severe.  *Maziarz v. Sec'y of Health & Human*

27

*Servs.,* 837 F.2d 240, 245 (6th Cir.1987).  Here, the ALJ evaluated and accounted for all of Miller's physical and mental limitations in his RFC analysis and finding.  Tr. 18-22.  Indeed, the ALJ determined that Miller was capable of performing a limited range of sedentary work, subject to numerous physical and mental limitations.  These limitations account for all of Miller's other impairments, both severe and non-severe.  Because the ALJ adequately considered all of a Mathew's impairments in formulating her RFC, any error committed by the ALJ in failing to find additional severe impairments at Step Two does not constitute reversible error.  *Maziarz,* 837 F.2d at 244.

### D.    The ALJ's Alternative Finding under Step Five of the Sequential Analysis Provides No Basis for Remand in this Case

Finally, Miller contends the ALJ erred by relying on vocational testimony that conflicted with the Dictionary of Occupational Titles ("DOT").  Doc. 14, p. 14.  In particular, Miller asserts that, in finding she could perform other work, the ALJ relied upon testimony from the VE that was inaccurate and not consistent with information provided in the DOT.  Doc. 14, pp. 14-15. This argument is entirely without merit because, under Step Four, the ALJ found that Miller could perform her own past work as an administrative clerk, as she actually performed the job. Tr. 77.  In reaching this conclusion, the ALJ found that Miller performed that job at the unskilled, sedentary level.  Tr. 77.  Based on his RFC determination, the ALJ concluded that Miller could perform this work and, therefore, was not under a disability.  Tr. 77.  The DOT never came into play in this analysis.  Tr. 77.

As an alternative basis for finding that Miller was not under a disability, the ALJ then proceeded to Step Five of the sequential analysis and found that a significant number of jobs existed in the national economy that Miller could perform.  Tr. 77-78.  In reaching this conclusion, the ALJ relied upon the testimony of the VE.  It is this testimony that Miller argues

conflicts with the DOT.  However, even if there was a conflict between the VE's testimony and the DOT, it is immaterial in this case.  The ALJ properly found the Miller could perform her past relevant work as an administrative clerk and, as a result, any conflicts between the DOT and the alternative jobs identified by the VE are not significant.  *See Voyles v. Astrue*, No. 10–175, 2011 WL 1326936, at *5, n.1 (E.D. Ky. April 5, 2011) (finding that, because the plaintiff was able to return to his past relevant work as a security guard, the conflicts between the DOT and the alternative jobs identified by the VE are not significant).  Accordingly, Miller's argument regarding the testimony of the VE provides no basis for relief in this matter.

### VII.  Conclusion and Recommendation

For the foregoing reasons, the final decision of the Commissioner denying Plaintiff Robin A. Miller's applications for DIB and SSI should be **AFFIRMED.**

Dated: May 1, 2012

_____
Kathleen B. Burke
United States Magistrate Judge

### <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).